# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

In re:

CHRISTOPHER W. STEWART,

       Alleged Debtor.

Case No. 07-11414-RGM
(Involuntary Chapter 7)

## MEMORANDUM OPINION

Metalmark Northwest, L.L.C., filed an unsuccessful involuntary petition in bankruptcy against Christopher W. Stewart who now seeks damages under 11 U.S.C. §303(i). He seeks his reasonable attorney's fees and costs under §303(i)(1) and damages – both compensatory and punitive – under §303(i)(2). The court will award attorney's fees and damages including punitive damages.

## Background

Metalmark obtained judgments against Stewart, and his father-in-law, F. Leith Boggess in the United States District Court for the District of Oregon on August 8, 2006 and October 20, 2006, in the aggregate amount of $856.165.28 following a multi-day jury trial.[1] Stewart and Boggess filed an appeal in the United States Court of Appeals for the Ninth Circuit. There was no stay pending appeal.

Metalmark retained William Daniel Sullivan and Kermit A. Rosenberg as Virginia counsel to collect the judgments. Metalmark domesticated its judgments in Virginia on November 15, 2006,

---

[1]The August 8, 2006 judgment was in the amount of $850,000. The October 20, 2006 judgment was for costs in the amount of $6,165.28.

and docketed the domesticated judgments among the land records of Loudoun County where Stewart and his wife, Laura Janelle Stewart, own a home as tenants by the entireties.[2]

Rosenberg had an interrogatories summons issued by the state court to assist in execution on the judgments. He examined Stewart before a commissioner on April 10, 2007. Stewart was not represented by counsel. Rosenberg questioned Stewart about his real property, financial documents, employment income, recent financial transactions, other assets and a statement of net worth dated May 1, 2006 Stewart signed which showed net assets of approximately $990,000, almost all consisting of the equity in the Stewarts' home.

Stewart was a 49% owner of Highland Ornamental Ironworks. He and possibly Jennifer Boggess,[3] his mother-in-law, began Highland in 2003 or 2004 when he contributed about $140,000 from the proceeds of the sale of his Oregon home[4] to the new venture. Tr. 4/10/2007 at 17. Stewart was employed by Highland and had income in 2005 and 2006 of $178,000.00 and $168,955.83, respectively, although his income salary had been reduced to $100 per week about October or November 2006 because he "wasn't able to contribute very much" to the business. Tr. 4/10/2007 at 10-11. He had no other earned income.[5] Tr. 4/10/2007 at 12, 25-26, 28. Highland's prospects had also diminished. Although Highland was still doing some jobs, it did not have any money and

---

[2]Metalmark also has a separate judgment against Mrs. Stewart arising from an arbitration award.

[3]Stewart stated that Jennifer Boggess was the 51% owner of Highland. How or when she acquired her interest was not discussed at the debtor's interrogatories. Tr. 4/10/2007 at 31.

[4]Stewart was not certain how the Oregon home was titled, whether it had been titled in his own name or jointly with his wife. Tr. 4/10/2007 at 17.

[5]He sold a parcel of land and a Jeep during the four months preceding April 10, 2007. Tr. 4/10/2007 at 26-28.

the remaining jobs were not anticipated to be profitable.[6]   "A lot has changed in the last six months"

at Highland.  Tr.  4/10/2007 at 29-30.  Metalmark issued a garnishment to Highland.  Tr. 4/10/2007

at 11.

    The only significant asset was the Stewarts' home which was held by Stewart and his wife

---

[6]Rosenberg asked Stewart about the status of Highland:

Q.    Okay.  Is Highland still doing jobs?

A.    Yes.

Q.    And what kind of jobs is Highland doing?

A.    Metal work.

Q.    And do you know what Highland is grossing a month on its metal working jobs?

A.    I know Highland doesn't have any money.

Q.    But –

A.    You want to talk about gross or you want to talk about net?

Q.    Tell me both.  Does Highland have ongoing jobs right now?

A.    We have some jobs that we are definitely trying to finish and we'll be fortunate if we do.

Q.    Is there any profit left in the jobs?

A.    Doubtful.  Doubtful.

Q.    What's the cost to finish the jobs?

A.    I don't know.

Q.    Ballpark?

A.    I don't know.  A lot has changed in the last six months.

Q.    Do the outstanding amounts – are the draws that you haven't pulled down yet going to cover the work, the cost
      of the work?

A.    I don't know.

Tr. 4/10/2007 at 29-31.

as tenants by the entireties.  The residence was exempt from execution by Metalmark because its judgments were against only one of the tenants by the entirety.  *See Vasilion v. Vasilion*, 192 Va. 735, 740, 66 S.E.2d 599, 602 (1951) ("[W]here a tenancy by the entirety in the fee simple is once created the property is completely immune from the claims of creditors against either husband or wife alone.").[7]  Mr. and Mrs. Stewart purchased the land  from a Boggess family trust about 2004 for about $300,000.  Tr. 4/10/2007 at 19-20.  They paid about $30,000 in cash from the sale of the Oregon home and borrowed the remainder.  Tr. 4/10/2007 at 21.  They then spent about two million dollars to build a  new house on the land they purchased.  Tr. 4/10/2007 at 23.  The construction loan was converted to permanent financing.  Tr. 4/10/2007 at 24-25.  The monthly mortgage payments were about $4,000.  Tr. 4/10/2007 at 26.  Stewart made the monthly mortgage payments from his income from Highland until his salary was virtually eliminated and thereafter, apparently briefly, from the proceeds of the sale of a parcel of land and a Jeep.  Tr. 4/10/2007 at 26-29.

Stewart pledged his 49% interest in Highland to Jennifer Boggess, his mother-in-law, on March 15, 2006, to secure five loans totaling $100,000.  Tr. 4/10/2007 at 31-33.  The loan proceeds "[w]ent to the house."[8]  Tr. 4/10/2007 at 32.  Rosenberg delved further into the loan and pledge at the continued debtor's interrogatories on May 3, 2007.[9]  Stewart gave Rosenberg a copy of the promissory note to Jennifer Boggess.  Tr. 5/3/2007 at 59.  The promissory note was obviously prepared by a layperson.  Tr. 5/3/2007 Ex. 1.  It recites five loans over a period of 14 months.  All

---

[7]Separate judgments, one against the husband and the other against the wife, held by the same creditor are not a joint judgment that creates a lien on tenants by the entirety property.  *Rogers v. Rogers,* 257 Va. 323, 512 S.E.2d 821 (1999).  Metalmark has never asserted that its separate judgments create a lien on the Stewarts' Virginia home.

[8]The promissory note actually recites that one of the loans was used to pay Stewart's attorney's fees in the Oregon suit brought by Metalmark.  That loan was for $41,000.

[9]Stewart was not represented by counsel at the continuation of the debtor's interrogatories .

4

are identified with specific dates that, with two exceptions, precede the date of the note, March 15, 2006. One of those two is the same date as the note and the other was non-specific but after the date of the note, "[o]n or about the end of March 2006." The language of the note recites that Stewart has "no other means to be able to repay these loans" and refers to the note as satisfying the debts and as "payment in full of these debts." There are no payment terms. There is no stated interest rate. There is no due date. The note also refers to a pledge of "all of my stock in its entirety in Highland."[10] Tr. 5/3/2007 Ex. 1.

Rosenberg asked about the dates of the transactions:

Q.    Back up to the hardwood flooring. The end of March '06, I'm trying to figure out how that could be mentioned in a note that was done some ten days to two weeks prior to that.

A.    On or about the end of March.

Q.    On or about the end of March is after the date of the note. And it's a notarized note.

---

[10]The promissory note reads:

This promissory note as executed this 15th day of March 2006 by me Christopher Stewart, satisfies the debt that I own to Jennifer Boggess for money borrowed during the building of my home at 18250 Blueridge Mountain Road, Bluemont VA, 20135.

The following is a listing of loans made by Jennifer Boggess to me. On December 20th, 2005 Jennifer Boggess lent me $10,000 for applicant purchases. On February 14th Jennifer Boggess lent me $24,000 for excavation, and foundation work for the retaining wall in the rear of the house. This money was paid directly to the excavation contractor on my behalf. In May of 2005 Jennifer Boggess loaned me $41,000 to pay lawyers fees resulting from the lawsuit brought on by an unnamed entity in Oregon. On or about the end of March 2006 Jennifer Boggess lent me $12,000 to pay for hardwood flooring material. On March 15th, 2006 Jennifer Boggess lent me $13,000 to pay for the construction dumpster that sat on the construction site for 15 months.

As I have no other means to be able to repay these loans, I Chris Stewart do herein pledge all of my stock in its entirety in Highland Ornamental Ironworks, Inc. to my partner Jennifer Boggess as payment in full of these debts as listed above in the amount of $100,000.

Executed this day March 15th, 2006.

A.    I see that.

Q.    Any explanation?

A    I recall being paid in March.

Q.    And your best recollection is that it was at the end of March?

A.    My best recollection is that it occurred in March.

Q.    Okay.  I'm finished with the exhibit.

Tr. 5/3/2007 at 62.

Rosenberg then questioned Stewart about his debts.  Tr. 5/3/2007 at 62-72.  He asked about mortgages and Stewart identified two, a first mortgage of about $1.5 million and a second mortgage of about $100,000.  Tr. 5/3/2007 at 62-63.  Rosenberg asked:

Q.    Tell me about your debts to individuals.  Exclusive from Metalmark judgment; I know about that.

A.    I owe a lot of people a lot of money.

Q.    Okay.  Tell me who they are.

Tr. 5/3/2007 at 64.

Stewart identified the law firm that had represented him in the Oregon litigation.  Rosenberg inquired whether Boggess, Stewart's father-in-law and co-defendant in the Metalmark case, was jointly liable on the obligation.  Stewart replied, "I don't know.  I don't know."  Tr. 5/3/2007 at 66. Stewart identified his mother as another creditor.  Tr. 5/3/2007 at 66.  He was not making payments to either the law firm or his mother.

Rosenberg continued:

Q.    And who else do you owe money to?

6

A.    Other than fairly small amounts.

Q    Who are the fairly small amounts to various people?  I need to know who you owe what to. I don't care how big or small the amount is.

A    Sobeit.  That's enough.

Q.    No, it's not enough.  I need to have all of them.  If it's not, we're going to come back again.

A.    Sobeit.

Q.    Huh?

A.    Sobeit.

COMMISSIONER AULT: Sir, let me interject.  As an officer of the court, Mr. Stewart, Mr. Rosenberg has a – he's entitled to ask you those questions, and if you fail to respond, you can be held in contempt of court.

THE WITNESS: My response is noted.

BY MR. ROSENBERG:

Q.    Let me see if I got this right.  You said you had several other little debts.  Now your response is you don't have several little debts.  Which is it?

A    (No response.)

BY MR. ROSENBERG: I think we should just come back again.  He's not answering.  If he doesn't want to do that then I'll just go to court.

BY MR. ROSENBERG:

Q.    Other than those little debts that you may or may not have, what about your utilities?  What about the phone bill?

A.    It's in my wife's name.  I'm not sure if it's current or not.

.   .   .

Q.    Okay.  And what about electricity?

7

A.      Dominion Power.

Q.      I'm sorry?

A.      That would be Dominion Power.

Q.      And whose name is that in?

A.      I don't know if it's both of ours or just mine, maybe my wife.

Q.      You say both or yours or maybe just your wife?

A.      Just mine.

Q.      Okay.

A.      Or possibly both of ours.  I don't know.

Q.      Okay.  Is that current?

A.      Current?

Q.      Has the current bill been paid?

A.      I believe it has, yes.

Q.      Is there any arrearage on that at all?

A.      I do not know.  I was just thinking the other day it had been a while since I had gotten a bill, so I don't know.

Q.      But to your knowledge it's not in default?

A.      No, I don't believe it is.

Q.      What about gas?

A.      Expensive.

Q.      Yeah, no kidding.

A.      Which gas?

Q.      Natural gas for heating.

A.      That would be AmeriGas.  That's one of the little ones.

Q.      And how much is AmeriGas owed?

A.      I don't recall.  It's less than $400 unless they filled me up again.

Q.      Is it past due?

A.      The less than $400 could possibly be.

                                    .   .   .

Q.      I've gone over your utilities, and you are a little refreshed about the little other small debts you owe?

A.      A little bit.

Q       Okay.

A.      What I hope that you may understand is that in a construction project, you don't always finish paying things upright at all.

Q.      I understand that.

        Were you your own general contractor?  Were you managing the job?

A.      Yes.

Q.      Okay.  Then you can explain it to me and identify these construction debts, and if they have potential liens against the property, I can recognize it.  I understand where you're coming from.

A.      I don't believe that they are.  When I say they're small, I'm talking about a couple hundred dollars.

Q.      They're probably not going to lien a job for that.  And do you know – remember who they are roughly?

A.      Shannon Stone, $600-and-some for gravel.

Q.      How much did you say, 600?

9

A.      Yeah.  $600-and-some-odd.

Q.      Okay.

A.      It may not even be that much.  I don't remember.  The invoice is $290.

Q.      Okay.  What else?

A.      That's it.  I don't even think I have parking ticket outstanding.

Q.      Okay.  You think you covered all the other debts you didn't?

A.      I believe so.

Tr. 5/3/2007 at 67-72.

The April 10, 2007 interrogatories lasted two hours and ten minutes.  The May 3, 2007 interrogatories lasted 25 minutes.  Neither revealed any assets on which Metalmark could execute to satisfy its judgment in whole or in part.

Metalmark made no significant further inquiry as to Stewart's debts or its eligibility to be the sole petitioning creditor before it filed its involuntary petition against Stewart on June 2, 2007, less than a month later.  The information it obtained at the debtor's interrogatories was not all the information it had, though.  It also knew that Stewart's co-defendant, Boggess, had a net worth of several million dollars and the likely ability to satisfy the judgment in full.  It knew that collecting from Boggess was a challenge.  Metalmark had been unsuccessful in serving or obtaining Boggess' attendance at interrogatory summons before Stewart's interrogatories were taken.  *See* Tr. 3/17/08 at 73-74 .  It knew that an appeal of the Oregon judgments was pending, but that there was no stay pending appeal.

Metalmark filed an involuntary petition in bankruptcy against Stewart on June 2, 2007.  Now represented by counsel, he opposed the involuntary petition and asserted a counterclaim under 11

U.S.C. §303(i) for his attorney's fees, costs, compensatory damages, and punitive damages.  The

parties engaged in discovery.  On August 15, 2007,  while discovery was pending, Boggess,

Stewart's father-in-law and co-judgment debtor, posted an $850,000 letter of credit as a bond and

thereby suspending further execution on the judgments and providing Metalmark with assurance of

payment of its judgments if it prevailed on appeal.

From the date of the filing of the involuntary petition through October 2007, Metalmark was

not given any information about additional creditors.  Beginning around November 2, 2007, Stewart

began providing documentation purporting to show that he had additional creditors not previously

identified.  On November 29,  2007, the parties entered into a joint stipulation identifying all

potential creditors.  On December 21, 2007, Metalmark offered to dismiss the involuntary petition

if Stewart would waive his claim for attorney's fees and damages.  He refused and the trial on the

involuntary petition was held on January 17, 2008.  At the close of Metalmark's case-in-chief,

Stewart moved to dismiss the involuntary petition for lack of sufficient petitioning creditors.  The

court found that Stewart had twelve or more creditors and dismissed the involuntary petition under

11 U.S.C. §303(b)(1).

The court later held a hearing on the claim for attorney's fees and damages.

## Legal Standard

### A.  *Section 303(i)(1): Attorney's Fees and Costs*

11 U.S.C. §303(i) provides that if an involuntary petition is dismissed other than on the

consent of all of the petitioners and if the alleged debtor does not waive his right to judgment under

§303(i), the court may award the alleged debtor his reasonable attorney's fees and costs without

regard to the petitioning creditor's good or bad faith. *See In re Jett*, 206 B.R. 407, 409 (Bankr.E.D.Va. 1997); *In re Atlas Mach. & Iron Works, Inc.*, 190 B.R. 796, 803 (Bankr.E.D.Va. 1995); *In re Fox*, 171 B.R. 31, 33 (Bankr.E.D.Va. 1994). An award of reasonable attorney's fees and costs is discretionary: "[A] bankruptcy court is left to its own discretion as to whether costs and attorney fees should be awarded pursuant to §303(i)(1), and the result is properly determined by a totality of circumstances test." *Fox*, 171 B.R. at 33 (citing *In re Ross,* 135 B.R. 230, 238 (Bankr.E.D.Pa. 1991)).

An alleged debtor may not be entitled to all of his attorney's fees in defending an involuntary petition. In *Fox*, the alleged debtor met with the petitioning creditor, a bank, several times before the bank filed the involuntary petition in an effort to restructure the debt owed to the bank. Fox represented to the bank at the meetings that the bank was his only creditor. The financial statements he gave to the bank for it to rely on in restructuring the debt showed fewer than twelve creditors. *Id.* at 34. The parties were unable to reach an agreement, and the bank filed a involuntary petition on June 17, 1993. On July 2, 1993, Fox asserted for the first time that he had twelve or more creditors. He claimed that he had 32 creditors in addition to the petitioning bank. The assertion was made in his answer to the involuntary petition and in his motion for summary judgment which were filed simultaneously. A hearing on the motion for summary judgment was held on September 14, 1993, by which time the bank had convinced only one other creditor to join its petition. *Id.*

The bankruptcy court found that the bank had no reason to believe that it could not be the sole petitioning creditor at the time it filed the involuntary petition and held that it was entitled to a reasonable time after the answer was filed to evaluate the answer and solicit additional petitioning creditors. The court stated:

12

> [The bank] should have known by August 31, 1993, whether it would be successful
> in recruiting two additional petitioners, and once this became apparent, the case
> moves into another realm.  [The bank], on notice that this court could well follow
> Judge Bostetter's *Reid* opinion [*In re Reid,* 107 B.R. 79 (Bankr.E.D.Va. 1989)], took
> a calculated risk by persisting in its petition and causing Fox to incur substantial
> additional attorney fees. Given the prior opinion from this district, I do not consider
> that the dismissal issue was a "close call."

*Id.* (citing *In re Ross,* 135 B.R. at 238).  The court awarded reasonable attorney's fees to defend the

petition incurred after August 31, 1993, when the bank should have known it cold not file the

petition alone and would not succeed in getting additional creditors to join the petition.  *Id.*

## B.  *Section 303(i)(2): Compensatory and Punitive Damages*

Compensatory and punitive damages may be awarded "against any petitioner that filed the

petition in bad faith."  11 U.S.C. § 303(i)(2).[11]  In an involuntary case, the presumption is that the

petition is filed in good faith.  *U.S. Optical, Inc. v. Corning Inc. (In re U.S. Optical, Inc.),* 991 F.2d

792, 1993 WL 93931, at *3 (4th Cir. 1993) (unpublished table disposition); *In re Caucus Distribs.,*

*Inc.*, 106 B.R. 890, 923 (Bankr.E.D.Va. 1989).  The burden is on the alleged debtor to prove by a

preponderance of the evidence that the petitioning creditor acted in bad faith.  *Atlas Mach. & Iron*

*Works, Inc. v. Bethlehem Steel Corp.*, 986 F.2d 709, 716 n.9 (4th Cir. 1993); *Caucus Distribs.*, 106

B.R. at 923.

*Atlas* is the principal Fourth Circuit case addressing §303(i).  Bethlehem Steel filed an

involuntary petition against Atlas after obtaining a $13.6 million judgment against it.  *Atlas*, 986 F.2d

at 711.  Bethlehem Steel filed as the sole petitioning creditor.  At the hearing on Atlas' motion to

---

[11] Punitive damages may be awarded even where compensatory damages are not.  On remand in *Atlas*, the
bankruptcy court determined that no compensatory damages were proven.  Nevertheless, the court awarded punitive
damages of $25,000 for purposes of punishment and as a general deterrent where the "involuntary petition was filed in
an attempt to use the Bankruptcy Court as a collection mechanism rather than following normal collection mechanisms
available through the state court."  *Atlas*, 190 B.R. at 804-06.

dismiss, Bethlehem Steel's in-house counsel and its auditor testified that they examined Atlas'

financial records prior to filing the involuntary petition and that although Atlas had more than 60

trade creditors, they believed only four or five creditors held "claims" against Atlas because, they

asserted, a "claim" exists only when a debtor defaults on an obligation to pay. *Id.* at 714. At the

conclusion of the hearing, the bankruptcy court made four findings of fact: (1) Atlas had twelve or

more creditors as of the petition date; (2) it was unreasonable for Bethlehem Steel's in-house counsel

to conclude that only a half-dozen "claims" existed against Atlas; (3) Bethlehem Steel filed the

involuntary petition for the purpose of collecting a debt; and (4) the involuntary petition was of no

benefit to other creditors. The bankruptcy court found that Bethlehem Steel acted in bad faith. It

denied Bethlehem Steel's request for additional time to solicit additional creditors to join the

petition. The district court affirmed. *Id.*

Bethlehem Steel appealed to the Court of Appeals. While some courts of appeal require a

showing of only objective bad faith or subjective bad faith under §303(i), the Fourth Circuit requires

proof of both: "To determine bad faith, a court examines whether a reasonable person would have

filed the petition (objective test) as well as the motivations of the petitioner (subjective test)." *Id.*

at 716. A bankruptcy court must assess the totality of the circumstances. *See U.S. Optical*, 1993

WL 93931, at *4. In *Atlas*, the Court of Appeals concluded that Atlas proved both objective and

subjective bad faith. Objective bad faith was established by the fact that a reasonable creditor would

have concluded that Atlas had twelve or more eligible creditors as of the petition date. Subjective

bad faith was established by the finding that Bethlehem filed the involuntary petition for an improper

purpose, i.e., to collect its debt. *Atlas*, 986 F.2d at 716. The Fourth Circuit affirmed the bankruptcy

court's decision.

14

The Court of Appeals relied on an earlier bankruptcy court decision, *Caucus Distributors*. In that case, the federal government filed an involuntary petition on the basis of penalty judgments it held arising out of a pending criminal prosecution of the debtors. The bankruptcy court, looking to both the objective and subjective elements of bad faith, concluded that while the former was shown, the debtor failed to prove the latter. *See Caucus Distribs.*, 106 B.R. at 926-928. The court found that objective bad faith was shown where the government knew the debtor had more than twelve creditors at the time it filed the involuntary petition as the sole creditor. *Id.* at 924. To determine subjective bad faith, the court held that the petitioning creditor's motivations had to be assessed in light of the proper purposes of bankruptcy, namely "(1) equality of distribution among creditors, (2) a fresh start for debtors, and (3) economical administration." *Id.* at 927-28 (citing *Report of the Comm'n on Bankr. Laws of the United States*, pt. I, July 1973, at 75). The court credited the Assistant U.S. Attorney's testimony that the federal government chose to pursue an involuntary petition because it believed this to be the most effective, efficient, and fair manner to collect its debt in light of the likelihood of the debtors' intra-corporate and extra-corporate transfer of assets, the thousands of people that the debtors had allegedly defrauded, and the large number of pending lawsuits against the debtors. In doing so, it rejected the debtor's theory that the United States Attorney was colluding with the Department of Justice's Criminal Division to aid prosecution of the debtors. The court concluded that the government's motives were proper and that bankruptcy was an appropriate means for the government to enforce its rights in a manner that would protect other creditors. *Id.* at 929-30. The bankruptcy court did not find bad faith, although it did dismiss the petition for lack of sufficient petitioning creditors.

15

*U.S. Optical,* an unpublished decision,[12] addressed actual malice. USO held the right to license its principal's patented process to produce an eyeglass lens product called "Photo-glastic." Corning had previously attempted to purchase the patent license rights, but when its efforts were rebuffed, it entered into a production and security agreement with USO. Under the agreements, Corning was to provide technical assistance, information, and certain financial guarantees to permit USO to perfect its product. USO failed in its production efforts and defaulted on its bank loans, which Corning paid as guarantor. USO claimed that Corning did not live up to its end of the bargain in providing technical assistance. Corning obtained a consensual judgment against USO for $1.6 million, and Corning foreclosed on all of USO's physical assets, which put USO out of business. At this point, USO's principal attempted to terminate the license of the patent to USO, which prompted Corning to file an involuntary petition against USO. *U.S. Optical*, 1993 WL 93931, at *1-2.

USO conceded that the petition was properly filed with respect to the statutory requirements, but alleged Corning filed in bad faith as part of "an extended pattern of dealing with USO designed to put USO out of business and force it to forfeit its patent for Photo-glastic." *Id.* at *3. USO pointed to Corning's efforts to purchase the patent from USO's principal, its failure to comply with the production agreement, its successful termination of USO's business by foreclosing on its physical assets, and the filing of the involuntary petition. It argued the bankruptcy was part of a scheme to acquire the rights to license the patent at a bargain price. The Fourth Circuit rejected USO's theory of bad faith. While Corning may have made earlier attempts to obtain the patent license, nothing it had previously done was itself improper, and USO "has not proven anything approaching the malice

---

[12]Unpublished opinions are not binding precedent in the Fourth Circuit. Local Rule 36(c).

or unconscionable behavior required by some courts to meet the subjective prong" of bad faith. *Id.* at *4. In any event, the court noted Corning's purchase of the patent rights, if it were successful in a bankruptcy sale, would be subject to court approval for reasonableness. *Id.* at *3. Despite the history between the parties, the Court of Appeals concluded that Corning did not act in bad faith in filing the involuntary petition.

These three cases teach that in the Fourth Circuit, the alleged debtor must prove both objective and subjective bad faith in order to prevail on a finding of bad faith. *Compare Atlas*, 986 F.2d at 716 (bad faith dismissal warranted where the alleged debtor proved both elements of bad faith), *with Caucus Distribs.*, 106 B.R. at 924-30 (denying bad faith dismissal where alleged debtor proved objective bad faith but not subjective bad faith), *and U.S. Optical*, 1993 WL 93931, at *3-4 (neither objective nor subjective bad faith proven, rejecting in the process the debtor's claim of actual malice). While each case addresses bad faith in the context of whether to dismiss an involuntary petition, the same test for bad faith is applied when the issue is the award of damages under §303(i)(2). *See Atlas*, 190 B.R. at 800-06 (determining that the Fourth Circuit's finding of bad faith in the dismissal context was law of the case on the issue of bad faith generally and could support an award of damages under §303(i)(2)); 2 *Collier on Bankruptcy* ¶303.15[5][a] (Alan N. Resnick & Henry J. Sommer, eds., 15th rev. ed. 2008) ("The determination of bad faith for purposes of section 303(i) is the same as determining bad faith more generally under section 303.")

## Discussion

### A. *Attorney's Fees and Costs*

A threshold question in any involuntary case is how many "holder[s] of a claim against such

person [i.e., the alleged debtor] that [are] not contingent as to liability or the subject of a bona fide

dispute as to liability or amount" exist.  11 U.S.C. §303(b)(1).  Where there are twelve or more

qualifying creditors,  three or more qualifying creditors must file the involuntary petition or join it

prior to dismissal or entry of an order for relief.  A qualifying creditor may file an involuntary

petition on its own only when there are fewer than twelve qualifying creditors of the alleged debtor.

11 U.S.C. §303(b)(2).  The question of how many qualifying creditors Stewart had and, thus,

whether Metalmark could file the involuntary petition on its own was the central question in the trial

on the involuntary petition.  The court dismissed the involuntary petition because Stewart had twelve

or more qualifying creditors, and no additional qualifying creditors joined Metalmark's petition.

Having secured the dismissal of the involuntary petition, Stewart may  recover his attorney's

fees and costs under 11 U.S.C. §303(i)(1).  By joint stipulation, the parties agreed that Stewart

incurred attorney's fees of $57,000 from the commencement of the involuntary case through trial on

Stewart's  counterclaim and post-trial briefing and motions.  Stewart retained counsel to defend

against the involuntary petition and to prosecute his counterclaim for damages.  Services included

counseling regarding the involuntary petition in bankruptcy, discovery in preparation for the trial on

the involuntary petition, and more than two days of trial on the involuntary petition and the

counterclaim for damages.  The reasonableness and necessity of the attorney's fees and costs sought

by Stewart are not contested.

Metalmark should have known by December 21, 2007 – the date on which it contacted

Stewart's counsel offering to dismiss the case – whether its involuntary petition had sufficient

petitioning creditors.[13]  Metalmark argued in closing that it did not dismiss the involuntary petition

---

[13]Metalmark never requested an opportunity to solicit additional creditors.

because it could not do so unilaterally once the alleged debtor asserted a counterclaim. While true, it could have filed a motion to dismiss the involuntary petition without consent, and the court would have dismissed the involuntary petition with appropriate conditions. Fed.R.Bankr.P. 7041 (incorporating Fed.R.Civ.P. 41(a)(2)). *In re Fox* limited attorney's fees to those incurred after the bank should have known it could not be the sole petitioning creditor. In that case, the bank acted in good faith in filing the petition and without knowledge of the existence of additional creditors. There were no red flags that should have alerted it to the fact that it could not be the sole petitioning creditor. In this case, Stewart is certainly entitled under 11 U.S.C. §303(i)(1) to his attorney's fees incurred after December 21, 2007, which amount to $37,584.

The more difficult question is whether to award Stewart attorney's fees incurred from the filing of the involuntary petition through December 21, 2007. The bank in *Fox* acted in good faith and had no reason to believe that it could not file as the sole creditor. Metalmark contends that Stewart's prepetition conduct led it to the reasonable belief that it could file the involuntary petition alone and thus fit within the rule enunciated in *Fox.*

Rosenberg questioned Stewart about his creditors at the continued debtor interrogatories held on May 3, 2007. Stewart specifically identified no more than eight creditors: two were secured by liens against real property; one was an insider; and one was identified as a possible creditor. There were no questions as to whether Stewart had guaranteed any debts or, with the exception of the obligation to the attorneys in the Oregon case, whether Stewart was jointly liable on any debts. After initial questioning on his debts, Stewart became non-responsive and did not identify any further creditors. There is no dispute that Metalmark knew specifically of only eight creditors at this point.[14]

---

[14]Metalmark should have recognized one Stewart omitted – Loudoun County for real estate taxes.

Nor is it disputed that Stewart stated that he owed small amounts to various other parties, which put Metalmark on notice that there might well be additional creditors. After a brief colloquy, Stewart answered additional questions about his creditors. Toward the end of the questioning, Rosenberg asked Stewart about whether they had covered all his debts to which Stewart responded, "I believe so." Tr. 5/3/2007 at 72.

While good faith is presumed on filing an involuntary petition, Metalmark should have satisfied itself before filing the involuntary petition that it was eligible to do so as the sole petitioning creditor. It had some basis to rely on Stewart's statements at the end of the debtor interrogatories that Stewart believed he had addressed all of his debts. However, this one answer must be placed in the context of the entire interrogatories and surrounding circumstances to determine the reasonableness of Metalmark's reliance.

The debtor was not represented by counsel at the interrogatories, and while appearing *pro se* does not diminish Stewart's obligation to be accurate, in this case, it was one more factor that should have made Metalmark more circumspect about the completeness and accuracy of Stewart's testimony. Who constitutes a creditor may be obvious to an attorney, but may not be as obvious to a layperson. Morever, Stewart testified that he was acting as his own general contractor on the construction of his home, that his company, Highland, was in financial distress, that he had liquidated property to pay his mortgage, that he had borrowed $100,000 from his mother-in-law and that he was unable to pay her. His response that he had identified all his debts came after a colloquy where he discussed his circumstances and the many small subcontractors and suppliers he had hired to work on the home and to whom he owed money. Tr. 5/3/07 at 70-74.

At trial, Stewart proved that he was jointly liable to some of the creditors whom he did not

20

identify at the interrogatories.  Even after these creditors were identified in the joint stipulation

identifying all of the putative creditors, Metalmark did not concede them as qualified creditors.  It

unsuccessfully litigated that fact.  The point is not that Metalmark litigated the matter as to these

creditors or was unsuccessful, but that even experienced and sophisticated bankruptcy attorneys had

questions about the status of these creditors.  When dealing with an unrepresented target of an

involuntary petition in bankruptcy, counsel may not throw circumspection to the wind and blindly

rely on the answers to select questions to file an involuntary petition.  Here Stewart's financial affairs

were consistent with the existence of more creditors.  He initially testified that were other small

creditors. He did not know that the questions were being asked in connection with a possible

involuntary petition.  Sullivan and Rosenberg, while accepting Stewart's statements as to his

creditors, did not blindly rely on Stewart's responses concerning the promissory note.  As discussed

below, they found those answers suspicious and the explanation incomplete and felt that they should

pursue the matter further.  Considering the totality of the circumstances, the court finds that

Metalmark did not conduct sufficient due diligence to rely solely on Stewart's statement.[15]  The very

interrogatories that Sullivan and Rosenberg found suspicious formed the basis for them filing as the

sole petitioning creditor.  Here, unlike in *Fox,* there were red flags.  Metalmark could not rely on the

interrogatories alone to conclude that it could be the sole petitioning creditor.

---

[15] Stewart's objection to Rosenberg's questions relating to his debts may be well-taken.  Metalmark's inquiry into Stewart's creditors may have exceeded the scope of debtor interrogatories under Virginia law.  The relevant statute provides that a judgment creditor may take debtor interrogatories "[t]o ascertain the personal estate of a judgment debtor, and to ascertain any real estate, in or out of this Commonwealth, to which the debtor named in a judgment and fieri facias is entitled." Va. Code (1950) §8.01-506(A).  *See, e.g.*, *Thompson v. Commonwealth*, 156 Va. 1032, 1035, 159 S.E. 98 (1931) (deciding under former law that debtor could not be jailed for refusing to answer questions that "do not relate to any of his own estate directly subject to the lien of the judgment and execution").  Inquiring about the debts a judgment debtor owes to third parties may not be reasonably calculated to assist in the determination of what property of the debtor is subject to execution.

*Fox* illustrates when a petitioning creditor may rely on the prospective involuntary debtor's pre-petition statements can be relied upon by the petitioning creditors. In *Fox*, the petitioning creditor was explicitly told by the alleged debtor that it was the only creditor. Fox made the statement with the intent that the bank rely on it to enter into a restructure agreement. The circumstances here are quite different than in *Fox*. Stewart told Metalmark that he had identified all of his debts after he stated that he had other small debts arising from the construction of his home. Metalmark knew he sold a parcel of land and a motor vehicle to make his mortgage payments. It knew he was a 49% owner of a business that was struggling. It knew Highland's outstanding contracts might well not be profitable. It knew Stewart's income had been reduced to a meager $100 a week. It was not clear how he was meeting his daily financial obligations. These are circumstances strongly suggesting Stewart was financially stressed and that other creditors could well exist. The answers to the interrogatories were not sufficiently clear or definite to permit Metalmark to reliably conclude that it could file an involuntary petition alone without further investigation. Stewart's testimony, unlike Fox' representation, was not sufficiently definitive and raised red flags. Stewart was testifying under oath, took the proceeding seriously, and, as it turns out, was telling the truth about having numerous small creditors. His conduct does not appear to have been an attempt to conceal his creditors from Metalmark as much as confusion, a lack of readily available information, inexperience, and a lack of sophistication. Because the interrogatories did not themselves form a sufficiently reliable basis for Metalmark to proceed alone without further investigation, and there was no significant further investigation, the court will award Stewart the remainder of his attorney's fees and costs from the filing of the involuntary petition through

22

December 21, 2007.  The total amount of attorney's fees awarded is $57,000.[16]

## B.  *Bad Faith Filing*

In order to obtain compensatory and punitive damages under 11 U.S.C. §303(i)(2), Stewart

must show that Metalmark filed the involuntary petition in bad faith by proving both objective and

subjective bad faith by a preponderance of the evidence.  *Atlas*, 986 F.2d at 716 n.9.  Stewart proved

both elements of bad faith by a preponderance of the evidence.

Metalmark's filing of the involuntary petition was not objectively reasonable.  The debtor

interrogatories that Metalmark took in April and May 2007, with one possible exception, plainly

showed that had Stewart filed a voluntary petition in bankruptcy, a chapter 7 trustee would have filed

a no-asset report.  In the ordinary course, Stewart would be expected to be granted a discharge but

no distribution would be expected to be made to creditors.  His ownership interest in the family

residence was held as tenants by the entireties.[17]   The debtor interrogatories failed to show he had

any assets of significant value.  It appeared from the interrogatories that pursuing an involuntary

chapter 7 petition against Stewart was unlikely to result in any dividend for any creditor and was

likely to prejudice all creditors because their claims would be discharged in bankruptcy.  In short,

Metalmark was shooting itself in its foot by filing the involuntary chapter 7 petition against Stewart.

It could expect no distribution and could expect its $856,165.28 judgment to be discharged in

---

[16]The court also concludes below that the involuntary petition was filed in bad faith.  That is an additional reason to award Stewart all of his attorney's fees.

[17] Under Virginia law, property owned as tenants by the entireties is "not subject in any manner to individual claims of creditors of one spouse, and that neither the land itself nor any interest therein may be reached in satisfaction of a separate judgment against only one of them."  *Reid v. Richardson*, 304 F.2d 351, 353 (4th Cir. 1962); *see also Vasilion v. Vasilion*, 192 Va. 735, 740, 66 S.E.2d 599, 602 (1951).  As Metalmark's judgment was not against Mrs. Stewart, it would not have been able to satisfy the judgment from the only asset of any significant value, the Stewarts' home.  Rosenberg, counsel for Metalmark, testified at trial that Metalmark was aware at the time of the filing of the involuntary petition that it could not obtain a recovery out of property held as tenants by the entireties.

bankruptcy as to Stewart.  Almost all creditors in these circumstances – holding judgments of more than $850,000 against an individual with no non-exempt property – want the debtor to avoid bankruptcy.  The hope that the debtor may someday pay something on the judgment is better than the certainty that the debt will be discharged in bankruptcy.   Moreover, Rosenberg testified that at the time of the filing of the involuntary petition, he had not investigated the prospect of filing a discharge or dischargeability complaint against Stewart.  In closing argument, Sullivan conceded that he did not foresee a possible §523 claim against Stewart that would render the Metalmark judgments non-dischargeable.  Tr. 3/17/08 at 63.  Even if Metalmark's judgments were non-dischargeable, Metalmark would have achieved nothing by filing the involuntary petition, obtaining an order for relief, and then having its own debt excepted from the discharge.  It faced significant litigation to obtain an order for relief.  During this period, its own collection activities would be stayed.  11 U.S.C. §362(a).  It would then have had to litigate its non-dischargeability claim.  After accomplishing all of this, it would have been in the same situation as it was before it filed its involuntary petition and would have received no distribution from the estate.  Filing an involuntary petition in these circumstances makes no sense at all.  In addition, all other creditors would be disadvantaged by the granting of a discharge unless they also held non-dischargeable claims and filed adversary proceedings to determine the dischargeability of their debts.  There is no indication that any debt was non-dischargeable.

Metalmark contended that it had a good reason for filing the involuntary bankruptcy petition. It asserted that there were possible avoidable transfers that could be recovered through bankruptcy.

The potential recovery was $59,000.[18] These allegedly avoidable transfers relate to loan transactions between Stewart and his mother-in-law, Jennifer Boggess, from February 2005 to March 2006. It appears that Stewart borrowed money from Mrs. Boggess and pledged his shares in Highland to secure the loans. The borrowed money was then used to pay for construction of the Stewarts' home which was owned with his wife as tenants by the entirety. Metalmark's theory was that Stewart converted his individually owned property (his stock in Highland) into protected entireties property (their residence). This was basically the same theory the Court of Appeals rejected in *Shaia v. Meyer (In re Meyer),* 244 F.3d 352 (4th Cir. 2001) (transfer is not voluntary conveyance under Virginia law when given in exchange for valuable consideration, which includes prepayment of deed of trust note encumbering tenants by entirety real estate in exchange for release of the deed of trust). Rosenberg testified that he believed Metalmark had meritorious claims for fraudulent and/or voluntary conveyances under Virginia Code §§55-80 and -81, but that a bankruptcy forum would be more advantageous than state court because of a possible statute of limitation problem and the availability for greater investigative tools in bankruptcy.

Rosenberg had no reasonable basis to believe that there was an impending statute of limitations on a state cause of action. Virginia law establishes a five-year statute of limitations for recovery of voluntary conveyances under Virginia Code §55-81. *See* Va. Code (1950) §8.01-253; *Gold v. Laines (In re Laines)*, 352 B.R. 397, 402 n.5 (Bankr.E.D.Va. 2005). Even more generously, "[t]here is no statute of limitations for an action under Va. Code (1950) §55-80" to recover a fraudulent conveyance. *Laines*, 352 B.R. at 402 n.5 (citing *Flook v. Armentrout's Adm'r*, 100 Va.

---

[18]Although the note was for $100,000, only $59,000 was used in connection with the house. The remaining $41,000 was used to pay Stewart's lawyers who defended him in the Oregon suit filed by Metalmark.

638, 639, 42 S.E. 686, 687 (1902)).  The earliest allegedly avoidable transfer was made in February

2005.  When Metalmark filed its involuntary petition in June 2007, nearly three years remained to

commence a voluntary conveyance suit, and no limitations period encumbered the fraudulent

conveyance claims.  The Bankruptcy Code would actually have imposed a two-year limitations

period on a trustee's avoidance powers without any prospect of a better recovery.  *See* 11 U.S.C.

§546(a); *Laines*, 352 B.R. at 402 n. 5.

Rosenberg testified that the tenor of the debtor interrogatories raised a concern that

something suspicious was happening.  The only concrete example was Stewart's  promissory note

to Mrs. Boggess.  The promissory note, although signed and dated by  Stewart and notarized,

referenced one loan made after the date of the promissory note and one on the date of the note.  The

other three preceded the date of the note.  Most commercial notes are dated on the day of the loan

so the recital of one loan on the date of the note is not unusual.  The last transaction was recited as

"on or about the end of March 2006" for $12,000.  Promissory notes may provide for future

advances.  The note may have meant nothing more than the delivery of hardwood material was

expected by the end of March 2006, and that Mrs. Boggess would pay for it at that time.  Stewart's

testimony can be understood in this light and Rosenberg asked no questions that would have clarified

this point.  The note was written by a layperson.  The note is awkward.  But, there is no reason to

believe that it does anything other than memorialize the intra-family transactions at a time when

construction was ending.  Rosenberg and Sullivan assert that it is suspicious.  Awkward or

suspicious, it is not enough standing alone or with anything else presented by Metalmark  to justify

filing an involuntary petition in bankruptcy.

Sullivan  suggested that Metalmark could have used an examination under Federal Rule of

Bankruptcy Procedure 2004 to further investigate any irregularities.  Mere suspicion is not a good faith basis to file an involuntary bankruptcy petition.  Neither is the desire to utilize Rule 2004.  A reasonable creditor would investigate suspicious conduct, but would not file an involuntary petition based on it alone.

Outside of bankruptcy, the recovery of a voluntary or fraudulent conveyance would have inured solely to Metalmark's benefit.  In contrast, within bankruptcy, Metalmark would be subordinated to administrative and priority claimants, including the trustee's fees and the trustee's professional fees, and would have to share any recovery pro rata with other unsecured creditors.  In addition, Metalmark would have had to convince a chapter 7 trustee to pursue the claims and likely would have had to fund the trustee's efforts given that no other assets were available to pay administrative expenses.[19]  Filing bankruptcy to pursue a fraudulent conveyance that could be adequately pursued in state court is not objectively reasonable.

In closing argument, Sullivan suggested the possibility of recovering preferential transfers as another reason for filing the involuntary petition.  Tr. 3/17/08 at 55-57.  This is based solely on the March 15, 2006 promissory note and pledge.   There is no evidence in the record to support the suggestion.  The evidence before the court shows that any potentially recoverable transfer made by Stewart occurred not later than the end of March 2006, which preceded the filing of the involuntary petition by more than a year and is outside the preference period for recovering an insider preference.

_____

[19] And in fact, this scenario is materializing in Mrs. Stewart's bankruptcy case.  The chapter 7 trustee in Mrs. Stewart's bankruptcy case filed an application to employ Rosenberg and Sullivan's law firm as special counsel to pursue potentially avoidable transfers.  The application reveals that because the estate is without substantial assets to compensate counsel, Metalmark will be paying the fees of the trustee's proposed special counsel: "Said firm will be compensated by Metalmark Northwest, LLC, and Metalmark Northwest, LLC may seek reimbursement of its reasonable fees and expenses incurred out of proceeds that the estate may realize from any recovery to the estate as a result of this engagement, subject to review and approval by this Court pursuant to 11 U.S.C. §330(a)."  Am. App. To Employ Special Counsel at 2, *In re Laura Janelle Stewart*, Case No. 07-10860-RGM (Bankr.E.D.Va. Aug. 6, 2008) (Docket No. 40).

*See* 11 U.S.C. §547(b)(4)(B).  The transfers Sullivan suggested as preferential fall  outside the scope

of the preference statute.

The totality of the circumstances leads the court to conclude that Metalmark acted in

objective bad faith.  A reasonable creditor would not have filed  this involuntary petition.

To prove subjective bad faith, Stewart must show an improper motive.  Intentions and

motives cannot generally be proven directly but must be inferred from actions.  Stewart argues that

Metalmark's improper motive was to harass him and thereby pressure Boggess, the co-debtor on

Metalmark's judgments, to pay the judgments  or at least post a bond to satisfy the judgments if

Stewart's and Boggess' appeals were unsuccessful.

At the time the involuntary petition was filed, Metalmark reasonably  knew that there was

no realistic prospect of recovery from Stewart beyond a potential state law fraudulent or voluntary

conveyance claim.[20]  Stewart at the interrogatories verified a financial statement submitted to the

Oregon federal district court showing his net worth to be in excess of $900,000.  He testified that this

constituted the equity in the real property owned as tenants by the entireties.  A quick review of the

county's land records would have verified Stewart's ownership in the property.  In contrast,

Metalmark knew Boggess had a net worth of several million dollars.  It knew Boggess was the likely

source of recovery.  For several months before the involuntary petition was filed, Sullivan was

---

[20]The value of any recovery is questionable.  The amount net of costs of litigation is relatively small in relation
to the judgment.  More importantly, if the recovery is simply to set aside the transfer and subject the 49% interest in
Highland to a sheriff's sale, the recovery is even less significant.  Stewart's share was a minority share and Highland was
in financial difficulty in June 2007. *Cheatle v. Rudd's Swimming Pool Supply Co., Inc.,* 234 Va. 207, 360 S.E.2d 828
(1987) (no personal liability); *Mills v. Miller Harness Company, Inc.,* 229 Va. 155, 158, 326 S.E.2d 665, 667 (1985)
(no in personam judgment when fraudulent conveyance set aside); *In re Stuckey,* 126 B.R. 697, 701 (Bankr.E.D.Va.
1990) (rejecting personal transferee liability).  *But see Price v. Hawkins,* 247 Va. 32, 439 S.E.2d 382 (1994).   In
bankruptcy, Metalmark might fare better.  Section 550(a) permits the court to avoid the lien on the Highland stock or
the value of the lien.  Metalmark has assumed that the value equals the amount of the loans but Stewart's interrogatory
answers suggest that that assumption may be overly optimistic.  Metalmark did not argue the effect of 11 U.S.C. §550(a)
or provide any valuation evidence.

unsuccessfully "pounding away" at Boggess to effect a recovery as he expressed it in his closing argument. Tr. 3/17/08 at 73-74. The filing of the petition brought great pressure on Stewart and his wife. There was, not unexpectedly, a significant emotional toll exacted by Metalmark on them. Tr. 3/14/08 at 68-72, 87-88. Stewart's wife is Boggess' daughter. Not surprisingly, two months after the commencement of this involuntary case, Boggess posted a letter of credit for more than $850,000 plus interest to secure the pending appeal of the Metalmark judgment to the United States Court of Appeals for the Ninth Circuit. Metalmark's recognition that Stewart was judgment-proof when this case was filed and its awareness that Boggess had deep pockets reflect that this case was filed for the improper purpose to collect a judgment by pressuring Boggess.

Events occurring after the filing of the involuntary bankruptcy support Stewart's argument that the involuntary petition was filed in subjective bad faith. Boggess's letter of credit was dated August 15, 2007, meaning that by that time or shortly thereafter, Metalmark was aware that its judgment would be paid unless it were vacated on appeal. Still, it continued to prosecute an involuntary petition with no discernible benefit. Metalmark was aware no later than December 21, 2007, that it was an ineligible sole petitioning creditor because Stewart had twelve or more qualifying creditors. When a petitioning creditor discovers that it is no longer eligible to prosecute an involuntary bankruptcy as the sole petitioning creditor, it may solicit additional petitioning creditors or seek to dismiss the case.[21] There is no evidence in the record that Metalmark made any effort to solicit additional creditors to join the involuntary petition. While it did make an offer to dismiss the case, it did not do so because Stewart would not agree to waive his claim for attorney's

---

[21] There may be an obligation to seek to dismiss the case. *See* Fed. R. Bankr. P. 9011(b); Va. Rules of Prof'l Conduct R. 3.1.

fees.  Sullivan at first argued that Metalmark could not dismiss the petition under Federal Rule of

Civil Procedure 41(a)(1), made applicable by Federal Rule of Bankruptcy Procedure 7041, because

Stewart filed a counterclaim and would not consent.  This may be true, but is irrelevant.  Metalmark

could have filed a motion for voluntary dismissal with the court.[22]  The one thing Metalmark could

not do in good faith was to continue prosecuting the case knowing that it was not eligible under 11

U.S.C. §303(b)(1).  Had it filed the case in good faith, it would have promptly sought to dismiss the

case when it recognized that it could not be successful.  The court notes that most of the attorney's

fees were incurred *after* Metalmark should have known it could not successfully prosecute the

involuntary petition.[23]

    The court finds that Metalmark acted in subjective bad faith.  Having found both objective

bad faith and subjective bad faith, the court concludes that Metalmark filed the involuntary petition

in bad faith.

### C.  *Compensatory and Punitive Damages*

    The court may "grant judgment against any petitioner that filed the petition in bad faith for

any damages proximately caused by such filing."  11 U.S.C. §303(i)(2)(A).  Metalmark filed this

petition in bad faith.

    Stewart seeks compensatory damages of $482,984 for interest he has to pay on his current

mortgage as the result of a failed refinancing allegedly the result of the filing of the involuntary

petition.  His evidence was not sufficient to prove these alleged damages.

---

[22] At closing argument, Metalmark's counsel conceded that Metalmark could have filed a motion with the court seeking to dismiss the involuntary petition.  *See* Fed. R. Civ. P. 41(a)(2).

[23] The vigor with which the case was prosecuted after Metalmark should have known that it would not prevail and after it offered to withdraw the petition is further evidence of its intent to injure Stewart and bring pressure on Boggess to satisfy its judgment.

Both Mr. and Mrs. Stewart testified regarding the difficulties imposed on them by the filing of the involuntary petition. They testified to both the financial and emotional hardship caused by the involuntary petition. While the court is sympathetic to the hardships, it has no means of quantifying the damages and no evidence was introduced as to the measure of damages.

Finally, punitive damages under §303(i)(2)(B) lie here. It is not necessary to find actual compensatory damages in order to award punitive damages. *In re Atlas Mach. and Iron Works, Inc.,* 190 B.R. 796, 803 (Bankr.E.D.Va. 1995). "An award of punitive damages under § 303(i)(2)(B) is intended to discourage unprincipled creditors from invoking the use of involuntary bankruptcy to serve a purpose at odds with core bankruptcy policy." *Id.* (citations omitted). Metalmark filed the petition in bad faith without any reasonable expectation of recovery from Stewart and with the goal of putting additional pressure on Boggess to post an appeal bond and pay the judgment. This is highly improper. Involuntary bankruptcy is not to be used for such purposes. Punitive damages of $57,000 are appropriate. This amount is proportional to the amount of damages actually caused and is generally consistent with Metalmark's financial circumstances.[24] *Id.* at 805 ("The general rule is that the amount of punitive damages must bear some reasonable relation to the injury inflicted and its cause.") (citations omitted).

## Conclusion

Metalmark filed the involuntary petition in bad faith. The court will enter judgment against

---

[24] The only evidence introduced regarding Metalmark's financial condition was contained in the transcript of closing arguments in the Oregon federal district court. The transcript constitutes hearsay, *see* Fed. R. Evid. 801(c), made applicable by Fed. R. Bankr. P. 9017. However, the parties jointly stipulated to its admission into evidence thereby waiving the hearsay objection. *See United States v. Hammoud*, 381 F.3d. 316, 335 (4th Cir. 2004) (stipulation on admissibility of evidence waives any objection), *vacated on other grounds*, 543 U.S. 1097 (2005). The transcript shows that Metalmark is winding down and that its only assets are the claims pursued in the Oregon federal district court lawsuit. The value of these assets is at least $850,000 plus interest, and payment is secured by Boggess' letter of credit.

31

Metalmark in the aggregate amount of $114,000, consisting of $57,000 in attorney's fees and

$57,000 in punitive damages.

Alexandria, Virginia
September 30, 2008

/s/ Robert G. Mayer
Robert G. Mayer
United States Bankruptcy Judge

Copy electronically to:

Stephen W. Nichols
Kermit A. Rosenberg
William D. Sullivan

14332